20-1137 Dupuch-Carron v. HHS. Mr. Webb, whenever you're ready. Thank you and good morning. May it please the Court. I would like to begin by addressing the significance of the Supreme Court's decision in Bostock v. Clayton County. The Supreme Court's decision in Bostock made it clear that the plain meaning of the words in the statute is the law, and that if the plain meaning of the words is unambiguous, the Court must apply the plain meanings of the word. Bostock made it clear that broad, inclusive words are not ambiguous. They simply demonstrate the breadth of a legislative command. The Court made it clear that if the words of a And the Court warned that proposed interpretations of a statute based on extra-textual considerations are sometimes suggested in an effort to deny the benefits of a statute to a disfavored group. The Special Master and the Court of Federal Claims judge violated the rules of law set out in Bostock when they chose to disregard... Let me just interrupt for a moment. For anyone who might ultimately hear this oral argument, just to be clear, you submitted a 28-J letter, and we're talking about the very recent Supreme Court opinion written by Justice Gorsuch. That's correct. Thank you. Thank you. Proceed. So, thank you very much for that. I probably should have been explicit in that regard. So, Bostock... Mr. Webb, it's Judge Cleaver. I think the panel understands and appreciates your argument based on the recent Supreme Court opinion. So, the question would seem to me to turn on whether the word return can ever be ambiguous. I think your assertion is it never can. Let me ask you this question. Let's assume, for example, a French citizen flies from Mexico to Paris in a jet airplane, flies over the Grand Canyon in Arizona low enough so the person can really appreciate the grandeur and the beauty of the canyon, admires the canyon, and the person says, I want to return to the United States to see the Grand Canyon in person. The person says, I want to return to the United States to see the Grand Canyon in person. Is that a correct use of the word return? I'm sorry. Most of your question was garbled. Could you please ask it again? Yes. A French citizen flies from Mexico to Paris over the Grand Canyon in Arizona. The plane flies low enough that the person can see quite clearly what the canyon looks like. The person says, I want to return to the United States to see the Grand Canyon in person. Is that a frivolous use of the word return? I don't think flying over the United States would be a sufficient presence to justify a subsequent entry into the United States to be a return. I believe that you need to have... My point is that I think you need to have a context in order to decide what was meant by return in that sentence I gave you. Did he mean return by air? Did he mean return in person? What I'm trying to get at is whether or not I'm trying to indicate to you that I don't agree with you that the word return is never ambiguous. I'm saying to you I think you need the context in order to appreciate what the word means. I think the factual context of the person's prior presence in the United States and subsequent return is relevant. It's necessary to understand whether or not there was a return, but I don't think that makes the word ambiguous. You just apply the unambiguous meaning of the word returned to the context, and that answers the question of whether there was a return or not. Wouldn't you agree to me that return ordinarily just means go back, but in my hypothetical it raised the possibility of going back in person or going back by airplane? And so my further information to decide what the word meant, assume the word was in a statute as opposed to in a sentence, I think you've admitted that you do need further context to understand whether in my hypothetical the person would want to return in person or to return by airplane. But I don't think that makes the word returned ambiguous. I think it means that you need to know what the person, in terms of, I guess what you're saying is that the person who flew over the Grand Canyon, did he go to the United States and did he go back when he returned to the ambiguous remains to go to and to go back, I mean to go back to some place you've been before, I think go to or go back can be ambiguous in the context of whether you go to the United States or go back to the United States when you fly over in an airplane. Yes. Thank you. I wanted to also ask you in the McGowan case, the court of federal release held that the very statute you're dealing with here, Roman III, applies only to those who previously had lived in the United States and returned. So if in order to return you have to have previously lived in the United States, I don't believe your client previously lived in the United States. Well, if lived in, I would say first that is what the McGowan case said, but it's not what the plain language of the statute says. If you talk about the value of context, and that is, the point is, is that Congress said what was required to satisfy Section 11C1. My point being is they required only two things. They required that the vaccine be made by the vaccine manufacturer located in the United States and the person returned to the United States within six months. I don't, there is nothing, go ahead. Well, the court of federal claims and the special master both put, from your perspective, a spin on the word return by saying how permanent did the return have to be. All I'm asking is whether or not there isn't a question on having, not on the return mission, but on leaving, you have to have been someplace in order to leave and return. And McGowan says you have to have previously lived in the United States to leave and return. And I'm asking why isn't that correct? Well, that's not correct because the plain meaning of the word returned, the plain meaning of the word go back to, there's no reason to suggest, even if the word returned were ambiguous, that it means that we require previously living in the place that you return to. That's a complete, that's an addition. It's a material, important, substantial addition to the requirement that is in the plain meaning of the word. So go back to your trip to the Grand Canyon. So if the person from Mexico landed at the Grand Canyon and walked around down into the canyon and back out in a day or half a day, and then went back, returned to Mexico, and then six months came back to the Grand Canyon and again spent a lunch there or a dinner there, it would satisfy the plain meaning of the word returned because he would have been in the United States at one point, and in a subsequent trip he had returned to there. There is nothing, even if there were some ambiguity in the term returned, there's nothing in the understanding of the word returned, there's nothing in the understanding of the Vaccine Act that requires living in the place you return to. Well, except, let me, the hypothetical doesn't really frame the issue in this case because it's not a matter of whether I was traveling over the Grand Canyon and returned. Both Judge Stoll and I have had the blessing of being pregnant a number of times. The question in this case is whether or not if a person being somewhere in the United States is three or four or five months pregnant, whether it's a return for the fetus who was in utero then, whether that now baby returns to the United States, and whether that's the return for him, right? That's this case. That is this case, on the question of whether Aiden Caron's presence in the United States as a child in utero was legally sufficient to make his subsequent entry into the United States a return. And on that point, it really shouldn't matter whether we call the child in utero a child in utero or a fetus or accumulation of cells. There was a presence, a physical presence in the United States by the child in utero, whatever words you use to identify it, and that occurred, and it has been legally recognized that the existence of a child in utero is a sufficient presence to be legally significant. And that is both the prior Vaccine Act cases that we cited. For purposes of having been vaccinated. Now, the cases we cited... The cases we cited... Mr. Webb, let Judge Fleminger finish, please. Okay, I'm sorry. As you quite candidly admit and state in your brief, it's a matter of first impression, because the three cases that led to the statutory revision dealt with the situation of whether or not a woman who was given a vaccine, who apparently the child then suffered from the infection of the vaccine, whether the child could have been considered to have received the vaccine. And it's clear the answer to that question, I know we knew from the three cases, Rudy's opinion, as well as the statute, for the question of whether or not those cases informed of whether or not your client was present in the United States, satisfying the return statute. It's a different situation, as you quite honestly admit. The very last part was garbled, I'm sorry. You've said that it was a question of first impression, and that you're arguing that by analogy, we should treat the three cases that led to the statutory revision as informing what the decision should be here on the question of first impression. I understand your argument. Yes, it is a question of first impression. The question of whether the presence of a child in utero in the United States is sufficient to make a subsequent entry into the United States a return. Okay. We'll reserve your rebuttal time, why don't we hear from the other side. Thank you. Thank you, Your Honor. This is Robert Coleman. I represent the Secretary of Health and Human Services. Good morning. Good morning. Case law dictates that the initial step in interpreting statutory language is to consider the context in which the word is used. So, the court is not to pluck a word, here the word returned, out of its context and apply a dictionary definition to that term in the abstract, but rather to consider the term in the context in which it is used. Here, the context in which it is used, 11C1BI, includes subsection 2, immediately before the subsection that's at issue today. And that subsection is very, it also expressly applies to extraterritorial applications, administrations of vaccines, but it also is very express in its curtailment of that, of that extraterritorial application. So, it's very narrow in the sense that it requires the individual to be both a citizen and in addition to be a federal employee or member of the armed services. And the reason I bring that up is because that narrow language, it would be inconsistent to read the following section, subsection 3, in its broadest sense in the way that petitioners are indicating, if the immediately preceding section is so narrow. That's one way in which the context dictates that some requirement here is necessary. But an additional point, weighing in favor of respondents' position, is that petitioners' interpretation would produce absurd results, and absurd results are to be avoided in interpreting a statute. One such absurd result was identified by the Court of Federal Claims on appendix page 22, and that was dealing with a French citizen who was vaccinated, who visited the United States but returned to France and was vaccinated there, and then a week later returned to the United States solely to transfer planes on the way to Mexico. But under petitioners' view of this case, that individual would be qualified to pursue a claim under the Vaccine Act, but that's an absurd result. Can I just switch gears a little? And I guess I'm looking right now at the statutory provision you cited, page 12 of red, and that's on the question of children in utero, whether children in utero are persons as a matter of law. And we all know, you talk in that page, about the recent statutory change that Congress made under the Vaccine Act on that regard, right? You know what I'm talking about now? Okay, so what's your argument about that? I mean, this provision that petitioners rely on talk about maternal immunization. I know it's a different thing, but how do you differentiate what Congress recently included in the statute for that particular case? Thanks for that question. The way I differentiate there is that the express terms of the 21st Century Cures Act do not provide for any provision regarding in utero presence. And that is particularly important in this case because the implications of the petitioner's argument is that the Vaccine Act will apply extraterritorially in this specific instance when there is no express language to authorize that. But there's-otherwise, if there is no express language, then there's the presumption against extraterritorial application of congressional action, and therefore that cuts against petitioner's argument. Council, so you're relying specifically on Section 8 of Title I, that definition? For the word- For what? Sorry, Your Honor. The definition of the word person or the definition of the word child? Yes. I believe that those definitions are still in effect. And can I- Mr. Webb, are you still- I think I hear you, Mr. Webb. Can you mute your line if you haven't already? I'm sorry? Could you mute your line? I'm hearing noise coming from your line. Would you mind muting it while Mr. Coleman is speaking? Oh, I'm sorry. Thank you. Mr. Coleman? Yes, Your Honor. Mr. Coleman, Judge Kerman here. Yes, I appreciate and I think I understand your Title I, Section 8 argument and your argument that the three court of federal claims cases and the statutory amendment deal with a problem that is very different from the in-utero presence issue that's presented by the statute that we're dealing with. The question I have is the court of federal claims opinion in footnote 13 referred to the question of ARDC's in-utero visits and whether that was presence, but he says that determination in and of itself would not be dispositive. I gather you disagree with that. What's your take on the question of whether or not the in-utero presence issue is dispositive? Your Honor, you're correct. We do disagree with that point by the judge of the court of federal claims. I'm not certain what the basis was for his conclusion in that regard, but he did find against petitioners on the issue of the interpretation of the meaning of the word returned, and that in and of itself also informed the basis of an affirmance. I appreciate that. My question is, do you embrace the analysis of the special master on the in-utero presence issue? Yes. We do generally embrace the analysis of the special master regarding in-utero presence. He did find that there is no expressed provision for in-utero presence, which is our argument as well,  that it's not necessary to re-evaluate the test and the definition of the word person, which we also agree with. That remains standing under 1 U.S.C.A. as we already addressed. As I understood it, your position on the in-utero presence is a plain meaning of the statute analysis based on Title I, Section 8. Yes, that's correct. There is no... There is no reason to look beyond simply the definition as provided by Section 8 of 1 U.S.C. But more than that, there is no expressed language. If we're looking to the 21st Century Secures Act amendments, there is no language there to indicate anything about extraterritorial in-utero presence establishing grounds for extraterritorial application of the Act. So that's just further reason to support our position. It would have been quite easy for Congress to deal with that issue had it chosen to, correct? Yes, that's correct, Your Honor. Well, except that when Congress dealt with it, we're saying this is a question of first impression. So in fairness, this wasn't an issue that they would have been necessarily aware of because there hadn't been cases yet decided that involved... raised this question, right? That... I'm not sure what Congress was aware of, of course. But, yes, it's true that this is an issue of first impression. So it's possible that Congress wasn't aware of it, but it's also possible that Congress was aware of it and that Congress intentionally omit that language and we're left with what the language is that was provided by Congress. And that language does not provide any express provision. Well, I kind of think that most of it can be said. I think something can be said with regard to that and that Congress knew it had to add specific provision to account for that. I'm not sure what else to make of that, frankly. Understood, Your Honor. Anything further? I wanted to ask the government. In McGowan, as I pointed out, Mr. Coleman, in my conversation with Mr. Webb, McGowan seems to say that you have to have had a real presence in the United States before you left. You have to have lived there. Does the government justify that interpretation of McGowan? Yes, to the extent that there needs to be some type of residency established, but no in the sense that McGowan was fairly rigid in requiring some-it appeared to be some type of permanent domicile-type presence. On the return side? Yes, on the return side. The thing that interests me about the statute is that the word return necessarily implies that you have to have been somewhere in order to return to it. In this case, the gloss on return is put on the degree of permanence required at the return, whereas McGowan puts a gloss on the emphasis on how long you were someplace before you left. And if you look at the statute we have here, the Roman II and the Roman III, the Roman II provision deals with military and governmental personnel that have temporarily gone abroad. Those persons presumably had some fixed presence in the United States before they left. And one might interpret Roman III to have a similar requirement for purposes of how long you had been in the United States before you left to go abroad. Yes, and to the extent that McGowan and the context provided around this subsection, this particular subsection, indicate that we also agree. We're relying heavily on the statutory context in which the word returned is used to figure out what the meaning of that word is, and it does include some type of residency prior to receiving the vaccine. And in this case, I showed you with a cert that the individual had no such similar presence, and even if they came to the United States, it wasn't for a long enough period of time to qualify to satisfy McGowan. Yes, that's correct. If the Court has any further questions, I would be happy to answer those. Any further colleagues? I think we're done. Thank you very much. Thank you very much. Okay. Mr. Webb, you can unmute now for the remainder of your rebuttal. Thank you. I want to address a couple of things quickly. The first is that Section 11C1B13 isn't narrow, and it isn't a restriction on who can qualify. It's an explicit extension of coverage of the Vaccine Act. And it satisfies, it eliminates the presumption against extraterritorial applications. The whole purpose of that section is to provide extraterritorial protection, or coverage of the Vaccine Act. And so the whole purpose of that, as opposed to Section 1.2, is to provide access to the program to people who don't have a prior presence, who haven't previously lived in the United States. The whole purpose of that, the access out to requirements that the vaccine is made by a vaccine manufacturer located in the United States, and that the person returned. And it does not specify the nature or the duration of the prior presence. And it doesn't state, govern the nature, it doesn't limit the nature or purpose or duration of the return. That was a critical error that the Special Master and the Court of Federal Claims made, and I'm concerned that you might make it up. Let me just say one quickly about the Section 1, the Section 1, that's from an act called the Born Alive Child Protection Act. And the very end of it says, Section C of that says, nothing in this section shall be construed to affirm, deny, expand, or contract any legal status or legal right applicable to any member of a species homo sapien at any point prior to being born alive as defined in this section. And the three decisions from the Vaccine Act that we cited had been decided before the enactment of the 21st Century Cares Act and had held that a child in utero was a person. They were addressing, focusing on the question of whether that person received a vaccine. But they assumed, essentially, that a child in utero was a person for the purpose of the Vaccine Act. And so there was already case law which said, concluded, that a child in utero had a legally significant presence. And that added to and I want a little  detail on that. And that non-dimension the Social Security Act decisions which basically say that the presence of a child in utero is sufficient for that context for the father to either support that child before he died or to be able to   utero. And they gave no reason why that presence should not be sufficient to make a subsequent entry into the United States of Return. Thank you. We thank you, Mr. Webb, Mr. Coleman, and the case is submitted.